IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANN KREJCI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| NEBRASKA STATE COLLEGES | ) | |
| ACTING AS CHADRON STATE | ) | |
| COLLEGE; DR. LOIS VEATH, | ) | 4:08CV3256 |
| PRESIDENT OF ACADEMIC | ) | |
| AFFAIRS, individually; DR. CHARLES | ) | MEMORANDUM AND ORDER |
| SNARE, DEAN OF SCHOOL OF | ) | |
| ARTS AND SCIENCES, individually; | ) | |
| and DR. JANIE PARK, PRESIDENT | ) | |
| OF CHADRON STATE COLLEGE, | ) | |
| individually, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court pursuant to 28 U.S.C. § 636 and the consent of the parties on defendants' Motion for Summary Judgment (Doc. 53). The briefing schedule expired upon the filing of defendants' reply brief on April 22, 2010. The court has carefully reviewed the pleadings, the briefs, and the evidentiary materials filed by the parties. For the reasons explained below, the court finds and concludes that the motion for summary judgment should be granted in its entirety.

## I.  INTRODUCTION

Plaintiff was hired as an adjunct faculty member at Chadron State College ("CSC") beginning in the 1993-94 academic year. Commencing in the 2001-02 academic year,

plaintiff received annual appointments as a tenure track faculty member at CSC.  As a tenure track faculty member, plaintiff was required to complete her Ph.D. by the end of the calendar year 2006 in order to apply for tenure and continue her employment with CSC.

In May 2006, plaintiff inquired of Dr. Veath about options to extend the deadline to complete her dissertation and requested an extension of the deadline.  The request was denied.  Plaintiff had a hysterectomy in June 2006 and  maintains in this lawsuit that she is substantially impaired in the major life activity of reproduction.

In her amended complaint (Doc. 31), plaintiff asserts claims under Title I of the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as claims for a due process violation pursuant to the Fourteenth Amendment to the U.S. Constitution and violations of her right to free speech under the First Amendment to the U.S. Constitution.  Plaintiff alleges in her Amended Complaint that similarly situated male employees were granted extensions of time for both medical and personal reasons, and certain male employees attained tenure at CSC without completing a Ph.D.  Plaintiff complains she was wrongfully denied an extension of the tenure clock to complete her Ph.D., which resulted in her losing her job. She further complains that she was not considered for three open positions in the science area at CSC in the fall of 2007.

## II.  FINDINGS OF FACT

The court finds that these facts are uncontroverted for purposes of this Motion for Summary Judgment and constitute the material facts upon which a resolution of the issues

must be premised.

1.    CSC is a political subdivision of the State of Nebraska.[1]  At all relevant times, Dr. Lois Veath was Vice President of Academic Affairs for CSC, Dr. Charles Snare was the Dean of the School of Arts and Sciences at CSC, and Dr. Janie C. Park was President of CSC.

2.    The 2005-2007 Collective Bargaining Agreement ("CBA") between the Nebraska State College System Board of Trustees and the State College Education Association sets forth the requirements necessary for faculty members to attain the status of a tenured  Professor.  (Doc. 55-3 at p. 3/7, CBA, § 16.2(a)).

3.    Section 16.2 of the CBA requires that in order to be considered for tenure as a Professor or Associate Professor, a faculty member must have an earned Doctorate or other appropriate "Terminal Degree."  (Doc. 55-3 at p. 3/7, CBA, § 16.2(a); Doc. 55-1 at p. 11/50, Krejci Depo. at 43:14-18).

4.    Pursuant to this policy, employees with appropriate terminal degrees other than a Doctorate have been awarded tenure.  Examples of such employees are Assistant Professor of Information Science and Technology Phil Cary, Athletic Trainer Don Watt, and Art Professors Mary Donahue and Laura Bentz. (Doc. 55-1, Krejci Depo. p. 42/50, 166:20-167:12; Doc. 55-2 at pp. 39-40/48, Veath Depo. 153:13-154:25).

---

[1]  *See* Neb. Rev. Stat. § 85-301, *et seq.*; *O'Connor v. Peru State Coll.*, 605 F. Supp. 753 (D. Neb. 1985), *aff'd*, 781 F.2d 632 (8th Cir. 1986).

5.      For plaintiff's position, a Ph.D. was the terminal degree required to obtain tenure. (Doc. 55-1 at pp. 11 & 42/50, Krejci Depo. 43:19-22 & 167:13-16).

6.      Section 16.7 of the CBA provides that the maximum amount of service that may be allowed prior to an appointment of tenure "shall not exceed seven academic years."  The seven-year period may be extended only in exceptional circumstances.  (Doc. 55-3 at p. 6/7, CBA § 16.7; Doc. 55-1 at p. 11-12/50, Krejci Depo. 44:18-45:14).

7.      Under CBA § 16.7, a tenure-track faculty member must normally apply for tenure in his or her sixth year of service.  (Doc. 55-3 at p. 6/7, CBA §16.7(a); Doc. 55-2 at p. 27/48, Veath Depo. 105:7-17; Doc. 55-1 at p. 12/50, Krejci Depo. 47:20-25).

8.      Commencing with academic year 2001-02, up until the academic year 2006-2007, plaintiff received annual appointments as a tenure-track faculty member.

9.      Given the year plaintiff started on her tenure track, and as noted in her annual performance appraisals, plaintiff was required to obtain her Ph.D. by the end of 2006 so that she could apply for tenure in January of 2007.  (Doc. 55-1 at p. 19/50, Krejci Depo. 76:17-22; Doc. 55-16 at p. 5/12, Performance Eval. dated 3/16/2006).

10.    Under the CBA[2], employees may apply for a sabbatical or leave of absence for educational purposes, if such application is made by December 1st of the academic year prior

---

[2]  Section 8.1 of the CBA (Doc. 55-3) provides, in relevant part:  "Applications for sabbaticals shall be submitted to the Academic Vice President by December 1st of the fall semester of the year preceding the year for which the sabbatical is requested."

to the academic year in which the sabbatical or leave is sought.  (Doc. 55-3 at p. 2/7, CBA § 8.1; Doc. 55-2 at p. 32/48, Veath Depo. 125:14-21).

11.   Plaintiff was working toward her Ph.D. in Educational Administration through the University of Nebraska-Lincoln.  Dr. Sheldon Stick was her doctoral advisor.  (Doc. 55-1 at p. 3/50, Krejci Depo. 12:5-13).

12.   To obtain a Ph.D. in Educational Administration, Plaintiff was required to complete certain coursework, take comprehensive exams, and complete a dissertation.  (Doc. 55-4 at p. 9/39, Stick Depo. at p. 33).

13.   Dr. Stick structured plaintiff's course of study so that completion of her dissertation proposal would also count for a portion of Plaintiff's coursework and comprehensive exams.  (Doc. 55-4 at pp. 9-10/39, Stick Depo. at pp. 33-36).

14.   On or about January 19, 2006, Dr. Stick emailed the plaintiff, advising that he would go "out on a limb" and recommend that she be advanced to Candidacy, even though her coursework and comprehensive exams were still incomplete.  Dr. Stick emphasized the necessity of plaintiff obtaining approval of a dissertation proposal and developing a viable study.  He stated to her that he did not believe it would be possible for her to finish during 2006; however, he wanted her to finish the work by May 2007 and at the very latest by August 2007.  He advised plaintiff to "add the expectation, and requirement, for wrapping this project up to your list of things to do."  (Doc. 65-1).

15.   By March of 2006, plaintiff had completed virtually all of her coursework and comprehensive exams; she had not, however, completed the dissertation.  Nor had she obtained approval for any dissertation proposal.  (Doc. 55-4 at 11/39, Stick Depo. at pp. 38-41).

16.   Pursuant to the terms of the CBA, each year's performance evaluations of tenure-track faculty members include a discussion of progress toward the awarding of tenure. (Doc. 55-2 at p. 25/48, Veath Depo. 94:12-20).

17.   Each year during her annual review (including the performance review for the 2005 year which was completed in March of 2006) plaintiff represented she would be finished with her dissertation by the end of 2006. (Doc. 55-1 at p. 22, Krejci Depo. 85:12-86:1; Annual Performance Reviews, Docs. 55-9, 55-10, 55-11, 55-12, 55-13, 55-14, 55-15 & 55-16).  In her 2003 evaluation, Plaintiff represented that she had submitted a first draft of a dissertation proposal.  (Doc. 55-13 at p. 10/13).   In January 2004, plaintiff represented that she hoped to complete her dissertation in 2004.  (Doc. 55-14).

18.   In May 2006, plaintiff spoke with the Vice President of Academic Affairs, Dr. Lois Veath.  Plaintiff advised Dr. Veath for the first time that she did not think she could finish her dissertation before the end of 2006.  Plaintiff asked Dr. Veath about options to extend the deadline to complete her dissertation.  (Doc. 55-2 at pp. 35-36/48, Veath Depo. 137:17-139:6).

-6-

19.   By May 2006, plaintiff had missed the December 1, 2005, deadline to apply for a sabbatical or leave of absence for the 2006-2007 academic year.  (Doc. 55-2 at pp. 34-36/48, Veath Depo. 133:22-134:13, 138:3-11; Doc. 55-3 at p. 2/7).

20.   In July 2006, plaintiff made a formal request, under § 16.7 of the CBA, for an extension of time to complete her doctoral degree.  The bases for the request were that (a) plaintiff had an abdominal hysterectomy in June 2006, resulting in physical restrictions for a period of six to eight weeks, and (b) her five-year-old daughter had a knee biopsy for juvenile rheumatoid arthritis in July 2006.  (Doc. 55-19; Doc. 55-1 at p. 25/50, Krejci Depo. 98:18-25, 99:7-11).

21.   Plaintiff has one biological child and was almost 44 years old when she had the hysterectomy.  (Doc. 55-1 at p. 3/50, Krejci Depo. 9:11-16).

22.   During the academic year 2005-2006, plaintiff did not provide any documents from a healthcare provider or request absences due to any medical condition, nor did any medical issues affect her teaching.  (Doc. 55-1 at pp. 24 & 32/50, Krejci Depo. 94:5-95:25; 127:7-25).

23.   After receiving plaintiff's July 2006 extension request, Dr. Veath contacted Dr. Stick (plaintiff's doctoral advisor), with plaintiff's permission, to verify that plaintiff would be finished in the spring of 2007.  (Doc. 55-1 at p. 27/50, Krejci Depo. 106:3-8; Doc. 55-2 at p. 34/48, Veath Depo. 131:3-10).   Dr. Stick told Dr. Veath that he had recommended plaintiff as a doctoral candidate, but that plaintiff had not completed her dissertation.

-7-

Plaintiff did not have an approved dissertation proposal at that time.  Dr. Veath's notes of the conversation indicate that Stick told her it was taking plaintiff an unusually long time and that there would be long periods of time during which Dr. Stick would not hear from the plaintiff. (Doc. 55-20, July 24, 2006 letter from Ann Krejci to Dr. Veath with Dr. Veath's notes; Doc. 55-4 at pp. 21& 28 , Stick Depo. 78:7-79:13, 106:11-18).  Dr. Stick indicated to Dr. Veath that plaintiff would not have been able to finish her dissertation during 2006 "even if she had worked 24/7 since last spring." (Quoting Dr. Veath's notes) (Doc. 55-20; Doc. 55-4, Stick Depo. 78:7-79:13, 106:11-18).

24.   Plaintiff's extension request was denied by letter dated October 24, 2006.  The letter further advised that plaintiff "would receive a terminal contract[3] in your seventh and final year of probationary service at Chadron State College, the 2007-08 academic year." (Doc. 55-21; Doc. 55-2 at p. 39/48, Veath Depo. 153:8-12).

25.   Pursuant to the CBA, plaintiff requested reasons in writing for the termination. A meeting was held on October 31, 2006.  Dr. Veath's November 27, 2006 denial letter observed, "While the medical circumstances that you described in your [July 2006] letter are unfortunate, they occurred at a time when you were already at a point when the completion of your doctorate could not occur in the fall 2006, because you did not have a dissertation proposal that was approved by your committee."  (Doc. 55-22 at p. 3/3).

---

[3] Section 16.8 of the CBA provides:  "When a faculty member fails to achieve tenure after undergoing the campus review, that individual will be issued a terminal contract for the following academic year."

26.    As of the date of her deposition on October 2, 2009, plaintiff had not finished her dissertation and still did not have an approved dissertation proposal.  (Doc. 55-1 at pp. 4, 8, 16 & 48/50, Krejci Depo. 13:16-21, 32:4-7, 62:6-13, 191:9-14).

27.    Other "disabled" individuals, such as Roger Kendrick, were given extensions of their time to complete their Doctoral degrees.   (Doc. 55-1 at p. 41/50, Krejci Depo. 164:18-25; Doc. 55-2 at p.30/48, Veath Depo. 115:24-116:24).  Kendrick was in the second year of his tenure-track position when he was diagnosed with and treated for cancer, and Kendrick made his request for extension of time shortly after he learned of the diagnosis. (Doc. 55-2 at p. 35/48; Veath Depo. 137:11-16).  Other male faculty members were denied extensions of time to complete their degrees.  (Doc. 55-1 at p. 33/50, Krejci Depo. 129: 17-23).

28.    Another faculty member, Brad Fillmore, held the tenure-track position of a Assistant Professor of Sciences at CSC, and was scheduled to apply for tenure at the same point as the plaintiff, e.g., January 2007.  (Doc. 55-8, Affidavit of Kara Vogt, ¶ 2).  Dr. Veath was aware that in January of 2007, Fillmore was finished with his dissertation, except for a final experiment, the results of which he was having trouble obtaining due to laboratory problems.  (Doc. 55-2 at p. 25/48,Veath Depo. 97:2-98:15).  Mr. Fillmore was given the opportunity to apply for tenure in January of 2007, specifically conditioned upon the successful defense of his dissertation and completion of his terminal degree prior to issuance

of contracts for the next academic year in April 2007. (Doc. 55-2 at p. 26/48, Veath Depo. 100:1-23).

29.   Because neither plaintiff nor Mr. Fillmore had obtained a Ph.D. by the time contracts were issued in April 2007, both employees were issued terminal contracts for the 2007-2008 academic year.  (Doc. 55-1 at p. 8/50, Krejci Depo. 30:16-19; Doc. 55-24, Terminal Contract of Ann Krejci;  Doc. 55-25, Terminal Contract of Brad Fillmore).

30.   On June 5, 2007, Plaintiff filed an administrative charge with the Nebraska Equal Opportunity Commission ("NEOC") alleging sex and disability discrimination, which was amended on July 17, 2007, October 5, 2007, and January 17, 2008. (Doc. 55-1 at pp. 20-27, Krejci Depo. 20:4-27:18; *see* Doc. 59-1 at pp. 1-6/15).  An additional charge alleging retaliation was filed on January 9, 2009.

31.   Plaintiff received an "unsatisfactory" rating in the "scholarly" portion of her Performance Review issued on April 20, 2007.  (Doc. 55-17 at p. 4/6, Doc. 55-1 at p. 22/50, Krejci Depo. 87:2-20).  In the Performance Review itself, Dr. Snare and Dr. Veath made clear that the "unsatisfactory" rating was due solely to the fact that she had not completed her terminal degree as required.  (Doc. 55-17 at pp. 4 & 6/6).

32.   The "unsatisfactory" rating in plaintiff's April 20, 2007 Performance Review had no effect on plaintiff's pay or the terms and conditions of her employment, nor was it considered by the search committee when they reviewed plaintiff's applications for open

-10-

positions in 2007.  (Doc. 55-1 at pp 22-23/50, Krejci Depo. 88:7-89:15; Doc. 55-8, Vogt

Affidavit, ¶ 6).

33.   In October 2007, CSC advertised for three open positions in Human Anatomy

and Physiology, Genetics, and Organismal Zoology. (Doc. 55-26, Vacancy Announcement).

34.   The CSC search committee put together a series of standards based on the

qualifications and skill sets they were looking for in filling the three open positions.  (Doc.

55-2  p. 12/48, Veath Depo., 43:2-11; Doc. 55-6 at p. 15/19, Keith Depo. 55:11-57:6).)

35.   The criteria for the positions was that the employee have a Ph.D. or significant

progress towards a Ph.D. ("ABD")[4] in biology or a closely related field.  (Doc. 55-26,

Vacancy Announcement).

36.   After the search committee established the criteria for the open positions and

once the positions were posted, the committee reviewed the applications and created a list

of individuals it wished to interview over the telephone. This list was then forwarded to

Human Resources ("HR") Director Kara Vogt and Dr. Veath.  (Doc. 55-6 at pp.4-5/19, Keith

Depo. 13:15-14:21).

37.   Plaintiff applied for the positions in Zoology and Human Anatomy and

Physiology; however, the search committee determined that plaintiff was not qualified for

either of those two positions.   Thus, the committee did not seek to undertake even a

---

[4]  "All But Dissertation," the status obtained when an individual has completed the coursework and
exams toward a Ph.D., but has yet to complete the dissertation.

telephone interview of plaintiff for these two positions.  (Doc. 55-6 at p. 16/19, Keith Depo. 59:23-60:20).

38.   Even though the committee members were aware that plaintiff did not qualify for the Genetics position due to the area in which she was pursuing her Ph.D.[5], the committee tried to submit her as a person who would at least go through a telephone interview (the second of three steps of the application process) for the Genetics position.  (Doc. 55-6 at p. Keith Depo. 58:7-22).

39.   The HR Director reviews the documentation for the applicants selected by the search committee to interview and advises the committee as to whether the applicants meet the advertised qualifications.  (Doc. 55-2 at p. 14/48, Veath Depo. 50:10-22; Doc. 55-5 at p. 7-8/16, Vogt Depo. 25:19-26:2; Doc. 55-6 at p. 5/19, Keith Depo. 14:13-23).

40.   HR Director Kara Vogt determined that plaintiff should not receive a telephone interview for the Genetics position, because plaintiff was not working toward a Ph.D. in biology or a closely related field.  Rather, Plaintiff was working toward a Ph.D. in "Educational Administration."  (Doc. 55-5 at p. 5/16, Vogt Depo. 17:3-13; Doc. 55-6 at pp. 5 & 18/19, Keith Depo. 15:16-24, 66:10-18).

---

[5]  In 2007 it was necessary for CDC to focus on accreditation concerns; therefore, the required Ph.D. for tenure in plaintiff's position was a Ph.D. in biology or a closely related field.  (Doc. 55-6 at pp. 15-16/19, Keith Depo. 55:7-57:6).  By 2007, the plaintiff had already chosen and completed the coursework for a Ph.D. in Educational Administration.  It is not disputed that she would have been able to obtain tenure in her position, with the Ph.D. in Educational Administration, had she obtained her Ph.D. by the end of 2006; however, by the time plaintiff reapplied for the position, the terminal degree requirement had changed.

-12-

41.   At least one other individual, Adjunct Instructor Dr. Hannan LaGarry, was also denied an interview because his degree (a Ph.D. in Geosciences) was not considered a field "closely related" to Biology. (Doc. 55-8, Affidavit of Kara Vogt, ¶ 7).

42.   The Human Anatomy and Physiology position was filled by Dr. Twila Fickel, who has a medical degree.  (Doc. 55-8, Affidavit of Kara Vogt, ¶ 3).

43.   The Genetics position was filled by Dr. Wendy Jamison, who had received her Ph.D., in Biology and had strengths in molecular and microbial biology area.  (Doc. 55-8, Affidavit of Kara Vogt, ¶ 4).

44.   The Zoology position was filled by Dr. Matthew Brust, who completed his dissertation and obtained a Ph.D. in Entomology during the Summer of 2008.  (Doc. 55-8, Affidavit of Kara Vogt, ¶ 5).

45.   Plaintiff's position with CSC ended in May 2008.  (Doc. 55-1, Krejci Depo. 156:7-16; Doc. 55-24, Terminal Contract of Ann Krejci).

46.   Plaintiff has not attempted to obtain other employment since her employment with CSC ended in May 2008.  (Doc. 55-1 at p. 10/50, Krejci Depo. 40:2-19).

## III.  CONCLUSIONS OF LAW

### A.   Jurisdiction

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue in this court is proper under 28 U.S.C. § 1391.

-13-

### B.   Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see, e.g., Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 741 (8th Cir. 2009).  "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.  *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997); NECivR 56.1(a).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'"  *Prudential*

-14-

*Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial.  *See Wingate v. Gage County School Dist., No. 34*, 528 F.3d 1074, 1078 (8th Cir. 2008); Fed. R. Civ. P. 56(e)(2).  "To establish the existence of a genuine issue of material fact, '[a] plaintiff may not merely point to unsupported self-serving allegations.' *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005).  The plaintiff must substantiate her allegations with sufficient probative evidence that would permit a finding in her favor.  *See Smith v. International Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008).

### C.    "Constitutional" Claims; Sovereign Immunity; Capacity; Preclusion

#### 1.  *Whether Plaintiff Pled Any Constitutional Claims*[6]

In paragraphs 1, 34 and 35 of the Amended Complaint (Filing 31), the plaintiff asserts a right to relief under "the Equal Protection afforded by the Fourteenth Amendment[7] of the U.S. Constitution ... and the right to Free Speech protected by the First Amendment of the

---

[6]  The court presumes that the plaintiff is proceeding on the constitutional issues pursuant to 42 U.S.C. § 1983 because the statute is "the vehicle for seeking a federal remedy for violations of federally protected rights."  *Greenwood v. Ross*, 778 F.2d 448, 454 (8th Cir. 1985).

[7]  U.S. Const. amend. XIV provides, in relevant part:

   Section 1. ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

       ....

   Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

-15-

U.S. Constitution" against defendants Park, Veath and Snare.   She alleges that her

constitutional right to equal protection was violated because defendants Park, Veath and

Snare (a) treated her differently than her male colleagues because she was a female, and (2)

treated her differently than other employees "not perceived by the Defendant to be disabled."

These allegations also provide the basis for her claims under Title VII and the ADA.

Although the phrase "First Amendment" appears in the Amended Complaint, the court

has serious reservations as to whether the Amended Complaint actually pled any cause of

action relating to the First Amendment.  Based on the supplemental information contained

in the plaintiff's brief, it appears that the plaintiff's theory of recovery based on a First

Amendment violation stems from the statement in *Greenwood v. Ross*, 778 F.2d 448, 457

(8th Cir. 1985), that the filing of an EEOC charge and a civil rights lawsuit are activities

protected by the First Amendment, and the appellate court's observation that claims of

retaliatory discharge based on the First Amendment are commonly asserted in § 1983 actions.

In its discussion, the *Greenwood* court noted that claims for retaliatory discharge may be

based on 42 U.S.C. 1981[8], § 704(a)[9] of Title VII, or the First Amendment and held that "the

---

[8]  Section 1981 is not applicable in this case because the plaintiff has not raised any claim for race
discrimination.

[9]  Section 704(a) of Title VII, 42 U.S.C. 2000e-3(a), provides:

(a)  Discrimination for making charges, testifying, assisting, or participating in enforcement
proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his
employees or applicants for employment ... to discriminate against any individual ... because he has
opposed any practice made an unlawful employment practice by this subchapter, or because he has
made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

district court properly dismissed [Greenwood's] § 1983 retaliatory discharge claim based on § 704(a)."  Greenwood was, however, allowed to proceed on a § 1983 retaliatory discharge claim based on a First Amendment theory.

### 2.  Sovereign Immunity

Congress did not abrogate the states' Eleventh Amendment[10] immunity by enacting 42 U.S.C. § 1983, and it is well-settled that the State of Nebraska has not generally waived its immunity from liability in civil rights actions.  *See, e.g., Ramos v. State of Nebraska*, 396 F. Supp. 2d 1053, 1057-58 (D. Neb. 2005); *Biby v. Bd. of Regents of Univ. of Nebraska at Lincoln*, 340 F. Supp. 2d 1031 (D. Neb. 2004), *aff'd*, 419 F.3d 845 (8th Cir. 2005).  The court finds that the defendant Board of Trustees of the Nebraska State Colleges Acting as Chadron State College, i.e., CSC, is entitled to Eleventh Amendment immunity on all claims purportedly made pursuant to 42 U.S.C. § 1983.

### 3.  "Official Capacity" claims against Veath, Snare and Park

The Eleventh Amendment, however, does not bar a federal lawsuit which seeks to prospectively restrain a state official from acting in violation of the United States Constitution or federal law because such relief would simply prohibit the state official from

---

hearing under this subchapter.

[10]  The Eleventh Amendment to the Constitution of the United States provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

doing that which he or she has no legal right to do.  *Poor Bear v. Nesbitt*, 300 F. Supp. 2d

904, 914 (D. Neb. 2004) (citing *Ex parte Young*, 209 U.S. 123, 159 (1908)).  "'State officials

acting in their official capacities are § 1983 "persons" when sued for prospective relief, and

the Eleventh Amendment does not bar such relief.'"  *Ramos v. State of Nebraska*, 396 F.

Supp. 2d at 1058 (quoting *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).

> Section 1983 creates a cause of action against a person acting "under
> color of any statute ... of any State" who deprives another of a federally
> protected right.  42 U.S.C. § 1983.  "Only state actors can be held liable under
> Section 1983."  *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855
> (8th Cir. 2001).  "[T]he under-color-of-state-law element of § 1983 excludes
> from its reach 'merely private conduct, no matter how discriminatory or
> wrongful.'"  *Americans United for Separation of Church and State v. Prison
> Fellowship Ministries, Inc.*, 509 F.3d 406, 421 (8th Cir. 2007), quoting *Am.
> Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  To be liable under §
> 1983, the claimed deprivation must result from "the exercise of a right or
> privilege having its source in state authority," and the party charged with the
> deprivation must be one "appropriately characterized as [a] state actor[ ]."
> *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir.2007), *cert.
> denied*, --- U.S. ----, 128 S.Ct. 387 (2007), quoting *Lugar v. Edmondson Oil
> Co.*, 457 U.S. 922, 937 (1982).

*Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008).

### 4.  *"Individual Capacity" claims against Veath, Snare and Park*

Turning to plaintiff's "due process" or "equal protection" claims against defendants

Park, Veath and Snare[11], the caption of the Amended Complaint contains the word

---

[11] Only state actors can be held liable under Section 1983.  Since § 1983 requires "state action," the court
liberally construes the Amended Complaint to assert the "due process" claims against Park, Veath and Snare
in their official capacities as officers of CSC, which is a political subdivision of the State of Nebraska.  CSC
enjoys Eleventh Amendment immunity as to such claims.

-18-

"individually" after each defendant's name; however, the text of the pleading itself makes no mention of capacity. The requirements for pleading "individual capacity" claims were explained and applied in *Baker v. Chisom*, 501 F.3d 920, 924 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 2932 (2008):

> On appeal, Baker argues that his first complaint adequately named Chisom and Bruner in their individual capacities because the substantive paragraphs included a reference to Chisom and Bruner as "individual Defendants" and prayed for "exemplary damages" that may not be recovered in an official capacity suit. But our cases require more than ambiguous pleading. *See Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999) ("specific pleading of individual capacity is required"); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) ("only an express statement that [public officials] are being sued in their individual capacity will suffice"); *Murphy v. State of Arkansas*, 127 F.3d 750, 754 (8th Cir.1997) ("a clear statement that officials are being sued in their personal capacities" is required). A "cryptic hint" in plaintiff's complaint is not sufficient. *Egerdahl*, 72 F.3d at 620.

> The caption of Baker's first complaint named ten other County defendants "in their Official Capacities and in their Individual Capacities." The caption was silent as to the capacities in which Chisom and Bruner were named. The body of the complaint contained no "clear statement" or "specific pleading" of individual capacity, only allegations that were, at most, "cryptic hints."

If a complaint does not specifically name the defendant in an individual capacity, it is presumed the defendant is sued only in an official capacity. In this instance, the Amended Complaint contains only "cryptic hints" regarding the capacity in which plaintiff is suing the defendants. The court interprets the Amended Complaint as including only official-capacity claims. *Baker v. Chisom*, 501 F.3d at 923; *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619-20 (8th Cir. 1995) (referring to defendants by name in the caption and body of the

complaint did not provide the defendants with ample notice that they were being sued in their personal capacities).

### 5. Preclusion

Even if the pleading was found to have adequately stated "individual capacity" claims against defendants Veath, Snare and/or Park, the court agrees with the defendants that any "individual capacity" Fourteenth Amendment claims are precluded due to the comprehensive remedial schemes available under Title VII and the ADA to address the conduct alleged.

As explained by the court in [*Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir. 1999), *cert. dismissed*, 529 U.S. 1001 (2000)]:

> Section 1983 provides a federal cause of action for plaintiffs to sue officials acting under color of state law for alleged deprivations of "rights, privileges, or immunities secured by the Constitution and the laws" of the United States. *See* 42 U.S.C. § 1983. It is well recognized that a plaintiff may use section 1983 to enforce not only rights contained in the constitution, but also rights that are defined by federal statutes. *See Maine v. Thiboutot*, 448 U.S. 1, 4-8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Arkansas Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 523 (8th Cir. 1993). An exception to this general rule exists when a comprehensive remedial scheme evidences a congressional intent to foreclose resort to section 1983 for remedy of statutory violations. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 19-21 (1981). Courts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive. *See Pona v. Cecil Whittaker's, Inc.*, 155 F.3d 1034, 1038 (8th Cir. 1998).

*Grey v. Wilburn*, 270 F.3d 607, 611 (8th Cir. 2001) (quoting *Alsbrook*, 184 F.3d at 1010-11);

*see also, e.g.*, *Hobleman v. Kentucky Fried Chicken*, 260 F. Supp. 2d 801, 806 n.8 (D. Neb.

2003); *Greenwood v. Ross*, 778 F.2d at 455 (holding that a § 1983 action for retaliation may not be based on a violation of § 704(a) of Title VII).

The conduct alleged to constitute "equal protection" or "due process" violations is exactly the same as the conduct underlying plaintiff's claims under Title VII and the ADA. The court finds that Title VII and the ADA are comprehensive remedial schemes evidencing a congressional intent to foreclose resort to § 1983 for remedy of the statutory violations alleged in this case. The defendants' motion for summary judgment is granted as to the plaintiff's "due process" or "equal protection" claims.

**D.   ADA; "Official Capacity" Claims against Veath, Snare and Park**

CSC has Eleventh Amendment immunity as to any claims asserted under Title I of the ADA. *See Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 365 (2001). However, under *Ex parte Young*, 209 U.S. 123, 159 (1908), "'private individuals can in fact sue state officials under the ADA for prospective, injunctive relief only.'" *Fikse v. State of Iowa Third Judicial Dist. Dep't of Corr. Servs.*, 633 F. Supp.2d 682, 691(N.D. Iowa 2009) (quoting  *Grey v. Wilburn*, 270 F.3d 607, 609 (8th Cir. 2001)).

The ADA, 42 U.S.C. § 12112(a),  provides that "[n]o covered entity[12] shall

---

[12] The term "covered entity" is defined as "an  employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C.A. § 12111(2).  An "employer" is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person."  42 U.S.C.A. 12111(5)(A).

-21-

discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   "Discrimination" includes an employer's failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer. *Dropinsky v. Douglas County*, 298 F.3d 704, 707 (8th Cir. 2002); 42 U.S.C. § 12112(b)(5)(A).  The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C); *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 783 (8th Cir. 2006).

"Under the ADA, an employer may not discriminate against an employee because of the employee's disability."  *Lors v. Dean*, 595 F.3d 831, 835 (8th Cir. 2010) (citing *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007).  If there is no evidence of direct discrimination, the court analyzes ADA claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).  *Lors v. Dean*, 595 F.3d at 835.  The plaintiff bears the burden of establishing a prima facie case showing she (1) had a disability within the meaning of the ADA; (2) was qualified, with or without a reasonable accommodation,

-22-

to perform the essential job functions of the position in question; and (3) suffered an adverse employment action because of his disability. *Id.* The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's actions. *Id.* "If the employer meets its burden, the employee must show that the employer's justification is a pretext. *Id.* The plaintiff "must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a 'phony excuse.'" *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005). The plaintiff "must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008).

Citing *Bragdon v. Abbott*, 524 U.S. 624 (1998), the plaintiff maintains in this lawsuit that she is substantially impaired in the major life activity of reproduction due to the hysterectomy she had in June 2006. She states in her brief that the defendants regarded her as having an impairment "because they requested a detailed timeline involving the medical and personal aspects of her life which required her requesting the extension." (Doc. 62 at p. 17/33).

For purposes of deciding this motion, the court will assume, without deciding, that the plaintiff was substantially impaired in the major life activity of reproduction, and that condition might constitute a "disability" under the ADA. Even given the benefit of the assumption, the plaintiff has not shown that the alleged adverse employment actions were

-23-

made "under circumstances that give rise to an inference of unlawful discrimination based on disability."

The plaintiff has attempted to raise issues of material fact by suggesting that similarly situated male employees were treated favorably when they requested extensions of time in which to complete their terminal degrees. None of the evidence, however, suggests that any of the defendants took any action involving the plaintiff due to her stated disability, i.e., a substantial impairment in the major life activity of reproduction.

While it is true that Mr. Roger Kendrick was granted a one-year extension for "exceptional circumstances" under § 15.7 of the CBA, the evidentiary materials submitted by the plaintiff (Doc. 59-1 at pp. 7-8/15) do not support her position. These documents show that Kendrick requested the extension upon discovering that he had follicular lymphoma and secondary cancer which had spread to his bone marrow and spine. He needed to undergo radiation treatments and chemotherapy for treatment of a life-threatening disease. Mr. Kendrick was only in the second year of his tenure-track position in Physical Sciences when these events occurred.

The court finds that Mr. Kendrick was not similarly situated to the plaintiff, who did not timely advise any of the defendants that she required an abdominal hysterectomy. Plaintiff's condition was not life-threatening, and the surgery resulted in her having physical restrictions for a period of six to eight weeks. If the plaintiff had ongoing health problems

prior to June 2006, she did not timely discuss them with any of the defendants.  Nor did she timely request sabbatical leave or relief under CBA § 16.7 for "exceptional circumstances."

Another male employee, Mr. Brad Fillmore, requested an extension of time during his sixth probationary year for reasons that were beyond his control.  The circumstances of that incident, *see* ¶ 28, *supra*, show that Mr. Fillmore was given a short extension of the tenure clock, but was ultimately treated the same as the plaintiff (issued a terminal contract) when he failed to timely complete his terminal degree.

Although the plaintiff claims she was adversely affected due to her disability when she was denied an extension of time to apply for tenure, the uncontroverted evidence shows that CSC had a legitimate, non-discriminatory reason for its actions:  the belatedly-requested extension would have been futile.  The terms of the CBA, which governed the terms of plaintiff's employment, are uncontroverted.  By the summer of 2006, the plaintiff was not close to obtaining her Ph.D.  Plaintiff did not timely request a sabbatical or leave of absence that would stop the tenure clock.  Instead, she reported annually that she was making progress on obtaining her Ph.D. and never indicated (until May 2006) that she would not be able to finish her degree on time.  Plaintiff did not formally request an extension of time until July 2006, based on the June 2006 surgery.  By that late date, plaintiff had not even completed a dissertation proposal, and defendant Veath confirmed with plaintiff's doctoral advisor, Dr. Stick, that it would have been impossible for Plaintiff to finish her dissertation

-25-

before the Spring of 2007.  The plaintiff has failed to offer any evidence sufficient  for a reasonable trier of fact to infer discrimination.

To the extent the plaintiff alleges some violation of the ADA in conjunction with the positions in Human Anatomy and Physiology, Genetics, and Organismal Zoology advertised in the Fall of 2008, the uncontroverted evidence shows that the plaintiff did not meet the qualifications for those positions.  When she applied for the positions, the plaintiff did not have a Ph.D. or ABD in biology or a closely related field, which was an essential qualification at that time due to CSC's need to meet accreditation standards.  The individuals who were hired for these positions met the posted qualifications and were not similarly situated to the plaintiff, who was pursuing a Ph.D. in a field not related to biology and still had not completed any dissertation proposal.

### E.  Title VII Claims

"[R]ecent case law has recognized that Title VII, through Section 5 of the Fourteenth Amendment, legitimately abrogates a state's Eleventh Amendment sovereign immunity." *Thurber v. State of Nebraska*, 2006 WL 3392191 at *4, Case No. 4:06cv3174 (D. Neb. Oct. 26, 2006) (citing *Maitland v. Univ. of Minn.*, 260 F.3d 959, 964 (8th Cir. 2001), *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), and *Okruhlik v. Univ. of Ark.*, 255 F.3d 615, 627 (8th Cir. 2001)). None of the defendants are entitled to Eleventh Amendment immunity as to plaintiff's requests for relief pursuant to Title VII.  The court construes the Amended Complaint to state claims for sex discrimination, failure to hire, and retaliation pursuant to Title VII.

### 1. Sex Discrimination

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of ... sex[.]" 42 U.S.C. § 2000e-2(a)(1). "Discrimination occurs when sex 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1037 (8th Cir. 2010) (quoting 42 U.S.C. § 2000e-2(m)).

The burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to plaintiff's Title VII claims. To make a prima facie case, plaintiff must show that "'(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination.'" *Lewis*, 591 F.3d at 1038 (quoting *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008)). Such a showing creates a presumption of unlawful discrimination, requiring the defendants to produce legitimate nondiscriminatory reasons for their employment actions. *Id.* The burden then returns to the plaintiff to prove that the defendants' proffered reasons are pretextual. *Id.*

In this case, the uncontroverted evidence shows that plaintiff is a member of a protected class. The adverse employment actions alleged are that the defendants did not give her an extension of time or stop the tenure clock at her request, she was issued a terminal

-27-

contract, and her employment with CSC was terminated at the end of the 2007-2008 academic year.

For the reasons discussed above in conjunction with the ADA claims, the court finds that the circumstances do not permit any inference of discrimination and the plaintiff has failed to show a prima facie case of sex discrimination.

### 2. Failure to Hire

The elements of a prima facie case in a failure-to-hire claim are (1) the plaintiff is a member of a protected class, (2) she was qualified for an open position; (3) she was denied that position; and (4) the employer filled the position with a person not in the same protected class. *Longwell v. Omaha Performing Arts Soc'y*, 666 F. Supp. 2d 1035, 1042 (D. Neb. 2009) (citing *Dixon v. Pulaski County Special School Dist.*, 578 F.3d 862, 867-68 (8th Cir. 2009)).

While the evidence is uncontroverted that the plaintiff is a member of a protected class and was not interviewed or hired for three open positions in Human Anatomy and Physiology, Genetics, and Organismal Zoology, the court finds that the plaintiff was not qualified for the positions. The plaintiff had not completed her Ph.D. or achieved ABD status in biology or a closely related field. The circumstances do not permit any inference of discrimination. In any event, the plaintiff did not submit any evidence tending to show that the Ph.D./ABD requirement was a pretext.

### 2. *Retaliation*

Title VII prohibits retaliation against employees who initiate or participate in a proceeding or investigation that claims their employer violated Title VII. 42 U.S.C. § 2000e-3(a). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must demonstrate a prima facie case of retaliation, showing that: (1) she engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Recio v. Creighton Univ.*, 521 F.3d 934, 938-39(8th Cir. 2008). "Upon a prima facie showing, 'a presumption of retaliation arises, and the burden of production shifts to the employer to advance a legitimate reason for the employment action.'" *Id.* (quoting *Hughes v. Stottlemyre*, 506 F.3d 675, 679 (8th Cir. 2007). "If the employer does so, 'the presumption drops out and "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against the plaintiff."'" *Id.* (quoting *Hughes*, 506 F.3d at 679). The plaintiff has the ultimate burden of persuasion to show that the adverse employment action was motivated by intentional retaliation. *Id.*

The plaintiff did engage in the protected conduct of filing administrative charges with the NEOC. She contends the defendants retaliated against her for filing the charges by failing to provide her the opportunity for an interview, "thus barring the Plaintiff from seeking qualified employment from the Defendant violate [sic] the non retaliation provisions

-29-

of FEPA [sic][13] for retaliating against the Plaintiff for making a charge of discrimination against the Defendant Chadron State College and Dr. Lois Veath."  (Doc. 31 at p. 9/11, Amended Complaint at ¶ 38).

As discussed above, the plaintiff lacked the academic degree necessary to qualify her for consideration in these positions.  There is no evidence that CSC's refusing to interview her was motivated by intentional retaliation, and there is no evidence that CSC's reasons for imposing specific academic requirements were pretextual.

## IV.  ORDER

For the reasons discussed above,

**IT IS ORDERED:**

1.     Defendants' Motion for Summary Judgment is granted in its entirety.

2.     Defendants are given leave to file a motion for attorney's fees and costs pursuant to 42 U.S.C. § 12205 and/or 42 U.S.C. § 2000e-5(k).  Said motion shall be filed, together with a supporting brief and evidence index, no later than **June 1, 2010.**

3.     Judgment in favor of the defendants will be entered separately, after the matter of attorney's fees and costs is decided.

**DATED May 5, 2010.**

**BY THE COURT:**

**s/ F.A. Gossett
United States Magistrate Judge**

---

[13]  Probably Title VII, as plaintiff did not assert any claims under the Nebraska Fair Employment Practices Act, commonly referred to in this district as "FEPA" OR "NFEPA."

-30-